UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD GLANDA Personal
Representative of the Estate of
HELEN GLANDA,

      Plaintiff,

v.                                                                                            Case No. 07-13263
                                                                                          Hon. Sean F. Cox

TWENTY PACK MANAGEMENT
CORPORATION, et al.

      Defendants.
_____

## AMENDED OPINION AND ORDER

This matter is before the Court on Defendants' Motion for summary judgment. Both parties have briefed the issues and a hearing was held July 24, 2008. For the following reasons, the Court **DENIES** Defendants' Motion for summary judgment.

### I. BACKGROUND

This action arises out of the allegedly negligent care received by Plaintiff's decedent, Helen Glanda. Plaintiff alleges that another resident of the facility sexually assaulted Helen Glanda while he was in her room.

In September of 2005, Helen Glanda was a resident of the assisted living facility Sunrise Assisted Living at North Farmington Hills ("facility"). Due to a stroke, Helen Glanda "suffered from right sided paralysis and aphasia (inability to speak)". (*See* Pl.'s Response at 11). It is undisputed that the door to Helen Glanda's room was intentionally left open by the staff at night.

1

It is undisputed that on or about September 25, 2005, another resident of the facility, Harold Looney, was found by staff members in Mrs. Glanda's room. The incident report prepared by Sunrise staff member Antonia Brown indicates that Ms. Brown was doing her "normal checks" when she found Mr. Looney naked in Helen Glanda's room "with an erection" and "he had ripped [sic] Helen's brief off." (Ex. B to Def.'s Motion). A Report prepared by the Farmington Hills Police Department indicates that when Mr. Looney was found in Helen Glanda's room by the staff, Mr. Looney purportedly said "Leave us alone. I can do what I want with my wife." (Ex. C to Def.'s Motion).

Mr. Looney suffered from dementia. His medical records show that he had a tendency to get out of bed at night, but that he had never left his own room. There is no indication that Mr. Looney had ever engaged in violent conduct before this incident. During Mr. Looney's initial stay with Defendants, which was only for a few days in June, 2005, a service plan was created which noted that he was to be monitored because of his tendency to get out of bed. Mr. Looney left the facility, but later returned on September 23, 2005. The incident in question occurred on September 25, 2005 – just two days after Mr. Looney arrived at Sunrise. (*See* Docket Entry No. 50 at 12). It is undisputed that a new service plan was not created when Mr. Looney returned to the facility on September 23, 2005.

On August 6, 2007, a Complaint was filed on behalf of Helen Glanda.[1] On April 30, 2008, an Amended Complaint was filed against Twenty Pack Management ("Twenty Pack"); Sunrise Farmington Hills Assisted Living LLC d/b/a Sunrise Senior Living; Sunrise of North

---

[1] The action was brought by Helen Glanda's husband, Richard Glanda as her guardian. However, Helen Glanda has since deceased and Richard Glanda is now the personal representative of her estate.

2

Farmington Hills; Sunrise Assisted Living at North Farmington Hills; and Sunrise Senior Living Management, Inc. Plaintiff alleges negligence for failing to protect Helen Glanda from the assault and failing to prohibit the access of other residents to her room.

Defendants filed a motion for summary judgment on November 29, 2007, asking that Defendant Twenty Pack be dismissed from the action because it had hired an independent management company to run the facility. That motion was denied. On May 7, 2008, Defendants filed the instant Motion for summary judgment, arguing there is no liability.

## II. STANDARD OF REVIEW

Under FED. R. CIV. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## III. ANALYSIS

As a preliminary matter, Plaintiff's argument that the instant Motion is "an attempt to take a second bite at the apple" is wrong. [Response, p.7]. Plaintiff refers to Defendant Twenty

3

Pack's previously filed, and denied, motion for summary judgment. The order denying that motion made clear that it was not a ruling on the issue of liability, "[t]he issue for purposes of this motion is not whether Defendants were negligent in the care and supervision of Helen Glanda, but whether Defendant Twenty Pack may be held liable for any negligence." [Doc. 29, p.3].

### A. Did Defendants Have a Duty to Protect Helen Glanda from the Sexual Assault?

Plaintiff alleges that Defendants were negligent in failing to protect Helen Glanda from Harold Looney's assault and for failing to prohibit access to her room. To establish negligence, the plaintiff must prove: (1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach of duty was a proximate cause of the plaintiff's damages; and (4) that the plaintiff suffered damages. *Jenks v. Brown*, 219 Mich.App. 415, 417 (Mich.App. 1996). "The term 'duty' has been defined as 'essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person.'" *Dykema v. Gus Macker Enterprises*, 196 Mich.App. 6, 8 (Mich.App. 1992)(citation omitted). "In determining whether a duty exists, courts examine different variables, including: foreseeability of harm, existence of a relationship between the parties involved, degree of certainty of injury, closeness of connection between the conduct and the injury, moral blame attached to the conduct, policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach." *Graves v. Warner Brothers*, 253 Mich.App. 486, 492-493 (Mich.App. 2002). The question of whether a duty exists is a question of law. *Id.* at 492.

"Generally, an individual has no duty to protect another who is endangered by a third

person's conduct." *Murdock v. Higgins*, 454 Mich. 46, 54 (1997). "Where there is a duty to protect an individual from harm by a third person, that duty to exercise reasonable care arises from a 'special relationship' either between the defendant and the victim, or the defendant and the third party who caused the injury." *Id.* A special relationship exists if the plaintiff entrusts himself to the protection and control of the defendant, and in so doing loses the ability to protect himself.[2] *Id.* Examples of "special relationships" are common carrier - passenger; innkeeper - guests; employer - employees; landlord - tenant; and doctor / psychiatrist - patient. *Id.* at 55, n.11.

In the context of special relationships, "courts have established a duty of reasonable care toward only those parties who are 'readily identifiable as being foreseeably endangered.'" *Graves*, 253 Mich.App. at 494-495 (citations omitted). See also, *MacDonald v. PKT, Inc.*, 464 Mich. 322, 338 (2001)(citing *Mason v. Royal Dequindre, Inc.*, 455 Mich. 391, 404-405 (1997)(In a special relationship involving an invitee, the merchant has a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties); and *Jenks,* 219 Mich.App. at 421("Michigan courts have established in [the context of special relationships] a duty of reasonable care toward only those third parties who are readily identifiable as foreseeably endangered.").

In this case, Defendants concede their was a special relationship between them and Helen Glanda. [Reply, p.1]. Nonetheless, Defendants argue they are not liable for the acts of Harold

---

[2]See also *Graves*, 253 Mich.App. at 494 (citing *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 498-499 (1988)), "[t]he rationale behind imposing a duty to protect in these special relationships is based on control...[i]n each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself."

Looney against Helen Glanda because Plaintiff cannot establish that Helen Glanda was readily identifiable as being foreseeably endangered by Harold Looney. Defendant contends there is no evidence that Mr. Looney's conduct was foreseeable. In contrast, Plaintiff argues that "where a special relationship is found to exist, a defendant cannot be relieved from liability for the criminal acts of a third party." [Response, p.10]. Plaintiff cites *Williams*, 429 Mich. at 499, to support this assertion. Plaintiff's argument seems to be that existence of a special relationship guarantees liability for any injury committed by a third party. Plaintiff's argument is without merit. Nothing in *Williams* indicates that if the court finds a special relationship exists, the defendant is automatically liable for any injury inflicted by a third party. In fact, in *Williams*, the court held their was a special relationship because the defendant was an owner of land and the plaintiff was an invitee. Despite the special relationship and the duty to exercise reasonable care, the court held the property owner was not liable because the duty did not require him to maintain armed security guards to prevent criminal activity.

The court made a similar finding in *Babula v. Robertson*, 212 Mich.App. 45 (Mich.App. 1995). In *Babula*, the plaintiff took her minor daughter to the plaintiff's sister's house to be babysat. The child's aunt was asleep when the child arrived. She got up and let the child in, and went back to sleep while the child watched television in another room. The aunt's husband molested the child while she was unattended. The plaintiff brought a civil action against both the husband and the aunt. The claim against the aunt was for negligence. The *Babula* court held that the aunt did have a duty to use reasonable care in ensuring that the child was not endangered. *Babula*, 212 Mich.App. at 51. However, the court ruled that the injuries inflicted by her husband were wholly unforeseeable. The aunt testified that her husband had never

6

engaged in criminal conduct prior to the incident. Her parents, with whom the couple lived for seven years, also testified that they were not aware of any proclivity towards sexual abuse. The court held that because the injuries inflicted on the child were unforeseeable "[the aunt's] general duty of care while baby-sitting did not extend to the specific harm done in the immediate case." *Id.* at 51-52. Thus, the mere existence of a special relationship is not itself sufficient to impose liability for injuries caused by a third party.

Having conceded there was a special relationship between Helen Glanda and Defendants, the issue is whether she was a readily identifiable victim foreseeably endangered by Harold Looney. Whether the victim is "readily identifiable" is a question of fact. *MacDonald*, 464 Mich. at 338. Plaintiff establishes a question of fact regarding whether Helen Glanda was a readily identifiable victim. Defendants admit that the door to Helen Glanda's room was kept open, and had a sign on the door stating "leave door open." [Motion, p.5]. Further, Plaintiff asserts that Helen Glanda was unable to speak and was paralyzed on the right side of her body. [Response, p.11]. In the event of an assault, there is a question of fact whether Helen Glanda was readily identifiable as a victim because there was unfettered access to her room, she could not call out for help, and could not physically resist an attacker.

The remaining question is whether it was foreseeable that Harold Looney would engage in an assault. To establish foreseeability, Plaintiff relies on Defendants' failure to create a service plan for Harold Looney pursuant to R. 325.1922(1) of the Licensing Rules for the Homes for the Aged; and on Harold Looney's medical records which Plaintiff claims show that "Mr. Looney had a habit of getting out of bed during the night." [Response, p.11]. At the hearing, Plaintiff indicated the medical records only show Mr. Looney had a tendency of getting out of

bed within his own room. There is no evidence that Mr. Looney had ever wandered outside of his own room.

### 1. Alleged failure to comply with licensing rules

It is well-established in Michigan law that violation of an ordinance or of administrative rules and regulations is *evidence* of negligence, in contrast to violation of a statute which creates a *rebuttable presumption* of negligence. *Johnson v. Bobbie's Party Store*, 189 Mich.App. 652, 661 (Mich.App. 1991). However, before evidence of a violation of an administrative rule or regulation is admissible, the court must consider whether the harm suffered was that which the rule or regulation was designed to prevent. *Boggerty v. Wilson*, 160 Mich.App. 514, 528 (Mich.App. 1987).

In this case, Plaintiff relies on Defendants' alleged violation of R 325.1922(1), which requires that a "home shall have a written resident admission contract, program statement, admission and discharge policy and a resident's service plan for each resident." Defendants admit they failed to create a new service plan for Harold Looney's return stay. Plaintiff also submits a report from the state indicating that a new service plan was not created for Harold Looney. [Exhibit 3]. A service plan is defined as "a written statement prepared by the home in cooperation with a resident and/or the resident's authorized representative or agency responsible for a resident's placement, if any, and that identifies the specific care and maintenance, services, and resident activities appropriate for each individual resident's physical, social, and behavioral needs and well-being and the methods of providing the care and services while taking into account the preferences and competency of the resident." R. 325.1901(21). Plaintiff does not present any authority that the purpose of this regulation was to protect other residents. The focus

of the service plan appears to be determining the level of care required for the resident that is the subject of the service plan. The harm that the regulation appears to be aimed at preventing is harm to that particular resident, by ensuring the facility is aware of the particular needs and limitations of that resident. It is a foreseeable benefit that in creating a service plan for a particular resident, it may result in reducing the likelihood of that resident harming a fellow resident. But, that does not appear to be the harm the regulation was aimed at preventing.

In response to Defendant's Motion for Summary Judgment, Plaintiff seeks to offer Defendants' failure to comply with R. 325.1922(1) as evidence of negligence. However, Plaintiff's response does not offer any authority that the harm suffered by Helen Glanda was the type of harm the regulation was designed to prevent. Accordingly, Defendants' failure to comply with R. 325.1922(1) cannot be considered for purposes of this Motion.

**2.    Medical records**

The parties dispute whether Harold Looney's medical records are admissible at trial. Magistrate Judge Mona Majzoub entered a stipulated protective order on December 5, 2007 stating:

> IT IS HEREBY ORDERED that any records relating to Harold Looney, regardless of the source of the records or the circumstances under which they were produced, shall be used only for purposes of this lawsuit and shall not be reviewed, distributed or disseminated to persons other than the attorneys, staff members of the attorneys, litigants, and experts in this case unless otherwise ordered or allowed by the Court.

[Doc. 20]. Consistent with this protective order, on March 13, 2008, Magistrate Judge Majzoub granted Plaintiff's unopposed motion to compel Defendants to produce the medical records of Harold Looney. Defendants consented to the order and did not argue that the records were privileged. Defendants had previously refused to produce the records without a court order

9

compelling them to do so, or a signed authorization complying with HIPAA[3]. Defendants complied with the protective order and disclosed Harold Looney's records to Plaintiff.

Now, in the instant Motion, Defendants argue that Harold Looney's medical records are confidential and privileged against disclosure pursuant to MCL § 600.2157[4] and MCL 333.20175(1)[5]. Defendants argue that the fact that these medical records may be necessary to Plaintiff's case does not obviate the privilege against their unauthorized use. Defendants also contend that the language of the protective order does not permit the records to be disclosed at trial.

Plaintiff argues that 45 CFR § 164.512(e)(1)(I) provides that authorization from the patient to disclose medical records in a judicial proceeding is not required, in accordance with the regulation. The regulation provides that a covered entity may use or disclose protected health information without written authorization in the course of any judicial or administrative proceeding, in response to an order of a court, provided that the covered entity discloses only the protected health information expressly authorized by such order.

It is not necessary for this Court to decide whether the privileges now asserted by

---

[3] Health Insurance Portability and Accountability Act.

[4] Except as otherwise provided by law, a person duly authorized to practice medicine or surgery shall not disclose any information that the person has acquired in attending a patient in a professional character, if the information was necessary to enable the person to prescribe for the patient as a physician, or to do any act for the patient as a surgeon. * * *

[5] A health facility or agency shall keep and maintain a record for each patient, including a full and complete record of tests and examinations performed, observations made, treatments provided, and in the case of a hospital, the purpose of hospitalization. * * * A health facility or agency shall maintain the records in such a manner as to protect their integrity, to ensure their confidentiality and proper use, and to ensure their accessibility and availability to each patient or his or her authorized representative as required by law. * * *

Defendants apply. Defendants have already disclosed the records. The disclosure at issue now is *Plaintiff's* disclosure of the records received during discovery, not *Defendants'* disclosure. Defendants do not argue that either of the cited statutory privileges prohibit Plaintiff, who is neither a "person duly authorized to practice medicine or surgery," or a "health facility or agency," from disclosing at trial the records obtained from Defendants. Thus, the only issue that remains is whether the records in Plaintiff's possession are admissible at trial in light of the language of the protective order.

The medical records of Harold Looney are admissible in this case. Although the stipulated protective order does not explicitly state the records may be disclosed at trial, it does provide that who the records may be disclosed to can be amended as "otherwise ordered or allowed by the Court." This Court concludes that Mr. Looney's medical records are an integral part of Plaintiff's case, and as Plaintiff's disclosure of those records is not protected by privilege, Plaintiff may disclose for use as evidence only those relevant portions necessary for litigation of this case.

The final issue then is whether Plaintiff establishes a question of fact regarding whether Harold Looney foreseeably endangered Helen Glanda. Plaintiff presents evidence that Harold Looney suffered from dementia and had a tendency to get out of his bed at night, within his own room. Plaintiff also relies on the deposition testimony of Debra Fulton, which it contends creates a genuine issue of fact as to whether Mr. Looney foreseeeably endangered Helen Glanda.

Debra Fulton ("Fulton") was the Reminiscence[6] Coordinator at Sunrise at the time of the incident. (Fulton Dep. at 17). She is currently a consultant for the Alzheimer's Support

---

[6]Which entails caring for patients with dementia and Alzheimer's.

Network in Naples, Florida. (*Id*. at 20).

Fulton testified that "[t]his is a world of dementia. World-of-dementia people could be looking for companionship." (*Id*. at 40). She further testified as follows:

> Q. I want to go back to something you were saying earlier about this being a world of dementia. Can you explain what you mean by that?
> A. We need to help these people. They need our help. That's why we're there. So sometimes they become confused. They lose the ability to have correct decision-making, so we're there to help them.
>
> . . . .
>
> Q. Okay. You said that dementia residents lose the ability to have correct decision-making.
> A. Correct.
> Q. Is that something that's common within the Sunrise facility?
> A. It's common with people with dementia.
> Q. How about residents looking for companionship within the facilities, does that happen?
> A. It has happened.
> Q. Can you describe for me or explain to me a little bit some of those circumstances where it has happened before?
> A. Generally speaking, natural human needs, male, female will have an attraction, so our responsibility with family members' involvement, is to monitor that.

(42-45). Fulton further testified:

> Q. Do you have any training in dementia and treatment of dementia patients?
> A. Through Sunrise training and through 20 years of experience.
> Q. Would you expect that a patient with mild dementia would engage in the type of acts that Mr. Looney engaged in?
> A. Yes.
>
> . . . .
>
> Q. You learned of some conduct by Harold Looney in the middle of the night and you got a call from Antonia Brown, correct?
> Q. Is that your testimony?
> A. It does happen.
> Q. Is it something that you would expect to happen?
> A. You watch for it.
> Q. Is it something that you would expect or is it something that's --
> A. You do not expect it.
> Q. Is it something that might happen?

12

| | | |
|---|---|---|
| A. | You do not expect it. It might happen. You're trained to watch for it. | |
| Q. | In your years of experience, are you ever aware of anything like that happening? | |
| Q. | What you heard Mr. Looney doing in Helen Glanda's room the night of September 26, 2005, had you ever heard of anything like that occurring? | |
| A. | Yes, it does happen. | |

(*Id*. at 97-104). Fulton further testified:

| | |
|---|---|
| Q. | Do residents – pardon me. Do people sometimes come into facilities and engage in behavior that they had not otherwise engaged in? |
| Q. | Because of disorientation or because they're no longer living with their families? |
| A. | They become disorientated when taken out of their home setting to an unfamiliar setting. They can become disoriented. |
| Q. | The mere fact that Mr. Looney had been living for a couple of days at Sunrise in June of 2005 didn't make Sunrise his home, did it? |
| A. | No. |
| Q. | He was now taken from his home or from a family setting into a strange setting? |
| A. | Correct. |

(*Id*. at 124-125).

There are no cases in Michigan examining foreseeability in the context of an assisted living facility or nursing home assault between two residents. However, there are instructive cases from other states. In *Shepard v. Mielke*, 75 Wash.App. 201 (Wash.App. 1994), the court found the assault of a nursing home resident by the guest of another resident was potentially foreseeable. In *Shepard*, the plaintiff had brain damage. Due to her condition, she suffered "screaming fits," so the door to her room was often kept closed to prevent disturbing other residents. A staff member walked in and caught the husband of another resident assaulting the plaintiff. The *Shepard* court began by holding that a special relationship was not necessary because the duty of ordinary care required the defendant to take reasonable precautions to protect the plaintiff from harm. The court held that the defendant's "knowledge of the condition of its

13

residents creates a concomitant duty much like that of a hospital to safeguard residents against reasonably foreseeable risks of harm." *Id.* at 205-206. The court held there was a question of fact regarding foreseeability "[c]onsidering the number of visitors who enter and leave nursing homes daily and the level of vulnerability found in many residents, it is not 'highly extraordinary' a resident shut away in a room by herself, whose screams are often ignored, could be victimized by a third party." *Id.* at 206.

In this case, similar to the plaintiff in *Shepard*, Helen Glanda had a high level of vulnerability. Her door was left open so anyone could have access to her. She was partially paralyzed, and unable to speak.

Further, Harold Looney, who suffered from dementia and had a tendency to get out of bed at night was housed in the same vicinity. Moreover, Mr. Looney had only been at the Sunrise facility for two days before the incident took place. Defendant's own employee, Fulton, who has more than 20 years of experience with dementia and Alzheimer's, testified that: 1) it is common for people with dementia to become confused and have impaired decision-making abilities and for them to seek companionship within the facilities; 2) with respect to a patient with mild dementia, she would expect or watch for the type of acts that Mr. Looney engaged in because such incidents "do happen" and professionals are "trained to watch for it;" and 3) patients like Mr. Looney, who are taken out of familiar settings and placed in an unfamiliar setting, can become disoriented.

The Court concludes that there is a question of fact regarding whether it was reasonably foreseeable that Harold Looney would assault Helen Glanda.

### IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants Motion for summary judgment.

**IT IS SO ORDERED.**

<u>**S/Sean F. Cox**</u>
**Sean F. Cox**
**United States District Judge**

**Dated: September 29, 2008**

**I hereby certify that a copy of the foregoing document was served upon counsel of record on September 29, 2008, by electronic and/or ordinary mail.**

<u>**S/Jennifer Hernandez**</u>
**Case Manager**